1

2

3

4 UNITED STATES DISTRICT COURT

5 NORTHERN DISTRICT OF CALIFORNIA

6

7 DAN VIGDOR, et al.,                         Case No. 16-cv-05326-HSG

8        Plaintiffs,                          **ORDER GRANTING DEFENDANTS'
                                              MOTION FOR SUMMARY**
9   v.                                        **JUDGMENT, DENYING PLAINTIFFS'
                                              MOTION FOR PARTIAL SUMMARY**
10 SUPER LUCKY CASINO, INC., et al.,          **JUDGMENT, AND DENYING
                                              PLAINTIFFS' MOTIONS FOR**
11       Defendants.                          **JUDICIAL NOTICE**

12                                            REDACTED VERSION

13                                            Re: Dkt. Nos. 114, 116, 124, 135

14        Pending before the Court is a motion for summary judgment filed by Defendants Super

15 Lucky Casino, Inc. ("Super Lucky" or "SLC"), Nicholas Talarico, and Bret Terrill, Dkt. No. 114,

16 and a motion for partial summary judgment filed by Plaintiffs Dan Vigdor and Stephen Bradway,

17 Dkt. No. 116. For the following reasons, the Court GRANTS Defendants' motion, and DENIES

18 Plaintiffs' motion.[1]

19 **I.    FACTUAL BACKGROUND[2]**

20        Plaintiffs were early investors in Defendants' start-up company who decided to invest after

21 connecting with Defendant Talarico. *See* Dkt. No. 115-6, Ex. 4 at 33:3–24, 185:10–24; Ex. 44;

22 Ex. 28. On January 25, 2012, Plaintiffs each invested $100,000 in the company and in exchange

23 received a Convertible Promissory Note ("CPN"), with a principal amount of $100,000 and a 6%

24

---

25 [1] Plaintiffs additionally move for the Court to take judicial notice of the Certificate of Amendment
   of Articles of Incorporation of 12 Gigs, Incorporated, Dkt. No. 135, and the Certificate of
26 Amendment of Articles of Incorporation of 12 Gigs, Dkt. No. 124. At the summary judgment
   stage, the Court may consider the documents as evidence without taking judicial notice. *See, e.g.,*
27 *Ballen v. City of Redmond*, 466 F.3d 736, 745 (9th Cir. 2006). Further, the Court does not rely on
   either document in reaching its conclusions. Therefore, the Court **DENIES** Plaintiffs' motions for
28 judicial notice.
   [2] All facts listed in this section are undisputed unless otherwise noted.

1    interest rate. Dkt. No. 114-2, Exs. 3 and 4 ("CPNs"). Each CPN could be converted into equity

2    shares in the company under certain limited circumstances. *See* CPNs. The conversion process

3    for each CPN was governed by a Note Purchase Agreement. Dkt. No. 114-2, Exs. 6 and 7

4    ("NPAs"). Under the NPAs, two circumstances could lead to conversion: conversion would

5    occur automatically if the company sold equity shares that grossed at least $750,000, and

6    conversion could occur at Plaintiffs' option in the event of a corporate transaction, such as a

7    merger or sale of assets. *See* NPAs at §§ 1(e), (i), 2.2(a)–(b).

8         On July 29, 2016, Defendants attempted to repay Plaintiffs the CPN principal and accrued

9    interest. Dkt. No. 115-6 at Vigdor Decl. ¶ 21; Ex. 39; Bradway Decl. ¶ 10; Ex. 49. Plaintiffs filed

10   this action in response, claiming Defendants improperly attempted to eliminate their conversion

11   rights. *See* Dkt. No 95 ("FAC"). [3]

12   **II.    SUMMARY JUDGMENT STANDARD**

13        Summary judgment is proper when a "movant shows that there is no genuine dispute as to

14   any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

15   A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*

16   *v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is evidence in the

17   record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. *Id.* The

18   Court views the inferences reasonably drawn from the materials in the record in the light most

19   favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

20   574, 587–88 (1986), and "may not weigh the evidence or make credibility determinations,"

21   *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v.*

22   *Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008).

23        The moving party bears both the ultimate burden of persuasion and the initial burden of

24   producing those portions of the pleadings, discovery, and affidavits that show the absence of a

25   genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the

26   moving party will not bear the burden of proof on an issue at trial, it "must either produce

27

28   [3] A redacted version of the Fourth Amended Complaint can be found at Dkt. No. 146-2. A sealed,
     unredacted version can be found at Dkt. No. 92-5.

2

1    evidence negating an essential element of the nonmoving party's claim or defense or show that the

2    nonmoving party does not have enough evidence of an essential element to carry its ultimate

3    burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102

4    (9th Cir. 2000). Where the moving party will bear the burden of proof on an issue at trial, it must

5    also show that no reasonable trier of fact could not find in its favor. *Celotex Corp.*, 477 U.S. at

6    325. In either case, the movant "may not require the nonmoving party to produce evidence

7    supporting its claim or defense simply by saying that the nonmoving party has no such evidence."

8    *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1105. "If a moving party fails to carry its initial

9    burden of production, the nonmoving party has no obligation to produce anything, even if the

10   nonmoving party would have the ultimate burden of persuasion at trial." *Id.* at 1102–03.

11       "If, however, a moving party carries its burden of production, the nonmoving party must

12   produce evidence to support its claim or defense." *Id.* at 1103. In doing so, the nonmoving party

13   "must do more than simply show that there is some metaphysical doubt as to the material facts."

14   *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. A nonmoving party must also "identify with

15   reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91

16   F.3d 1275, 1279 (9th Cir. 1996). If a nonmoving party fails to produce evidence that supports its

17   claim or defense, courts enter summary judgment in favor of the movant. *Celotex Corp.*, 477 U.S.

18   at 323.

19   **III.    DISCUSSION**

20       **A.    CPN and NPA Terms**

21       The parties agree that the relevant contracts are the Convertible Promissory Notes and

22   Note Purchase Agreements. *See* Dkt. No. 146-5 at 4; Dkt. No. 127 at 6. Neither party contends

23   that adjudication of the breach of contract claims in the first and second causes of action requires

24   resolution of any disputed issue of material fact. *See* Dkt. No. 133-4 at 1; Dkt. No. 114 at 9–14.

25   The terms of Plaintiffs' respective CPNs and NPAs are identical. CPNs; NPAs.

26       The CPNs state that:

27           Unless earlier converted into Conversion Shares pursuant to Section
             2.2 of that certain Note Purchase Agreement . . . the principal and
28           accrued interest shall be due and payable by the Company on demand

3

by the Majority Note Holders at any time after the Maturity Date.

CPNs at 1.

The CPNs additionally state that "[p]repayment of principal, together with accrued interest, may not be made without the written consent of the Majority Note Holders." *Id.* § 1. The Maturity Date is defined in the NPAs as "the date that is thirty-six (36) months following the date of issuance" of each NPA. NPAs § 1(h). The Maturity Date for Plaintiffs' notes was January 25, 2015. *Id.*; CPNs at 1.

The NPAs also state that the "principal and unpaid accrued interest of each Note will be automatically converted into Conversion Shares upon the closing of the Next Equity Financing." NPAs § 2.2(a); CPNs § 3 (stating that the notes "shall be convertible into Conversion Shares in accordance with the terms of Section 2.2." of the NPAs). "Next Equity Financing" is defined as:

> The next sale (or series of related sales) by the Company of its Equity Securities from which the Company receives gross proceeds of not less than $750,000 (excluding the aggregate amount of debt securities converted into Equity Securities upon conversion of the Notes pursuant to Section 2.2 below).

NPAs § 1(i).

"Equity Securities" is further defined as:

> The Company's Common Stock or Preferred Stock or any securities conferring the right to purchase the Company's Common Stock or Preferred Stock or securities convertible into, or exchangeable for (with or without additional consideration), the Company's Common Stock or Preferred Stock, except any security granted, issued and/or sold by the Company to any director, officer, employee or consultant of the Company in such capacity for the primary purpose of soliciting or retaining their services.

*Id.* § 1(f).

Conversion pursuant to Section 2.2 of the NPAs results in a price per share based on either (1) "the price paid per share for Equity Securities by the investors in the Next Equity Financing," or (2) a price determined by dividing the "Valuation Cap" by "the number of shares of outstanding common stock of the Company immediately prior to the closing of the Next Equity Financing." CPNs § 3.1. Plaintiffs' notes list a "Valuation Cap" of $6,000,000, which would lower to $4,000,000 if both of the following were to occur:

4

(a) The Company does not raise an aggregate of at least $1,000,000.00 principal amount of convertible promissory notes pursuant to the Purchase Agreement by March 30, 2012 (including this Note and previously issued Notes), and

(b) The Company does not record gross revenue of $21,000.00 or more during any seven (7) consecutive day period prior to March 15, 2012.

*Id.* § 3.3.

Plaintiffs' notes were issued on January 25, 2012. CPNs at 1. Prior to the issuance of their notes, Plaintiffs and Plaintiffs' attorney corresponded by email with Defendant Talarico regarding the terms governing conversion. The following is a summary of their email exchanges:



- On January 17, counsel for SLC emailed Plaintiffs several clarifications, including: "Prepayment of the notes - please note that Section 1 of the Notes says the Company cannot prepay the Note without the consent of the holders of a majority of the notes (measured by the total principal outstanding, aggregated together). This gives investors more protection than the typical clause which says the Company can prepay at any time." Dkt. No. 144-2, Ex. 1.

- On January 19, 2012, Plaintiffs' attorney emailed Plaintiffs with an attachment of a

1  draft version of the Note with the highlighted text stating that "[p]repayment of

2  principal, together with accrued interest, may not be made without the written

3  consent of the Majority Note Holders." Dkt. No. 144-4, Ex. E at PLTFS000112–

4  13.

5  ▮ ████████████████████████████████████████

6  ████████████████████████████████████████████

7  ██████████████████████████████████████████

8  ████████████████████████████████████████████

9  ████████████████████

10  **B.    Prepayment (First and Sixth Causes of Action)**

11  Plaintiffs contend that the clause in the CPNs stating that "[p]repayment of principal,

12  together with accrued interest, may not be made without the written consent of the Majority Note

13  Holders" applies only to a repayment made prior to the Maturity Date. Dkt. No. 116 at 10–11.

14  Plaintiffs contend that, because prepayment with written consent of the Majority Note Holders can

15  only occur before the Maturity Date, repayment may not occur after the Maturity Date under the

16  same procedure, and Defendants' attempt to repay Plaintiffs therefore constituted breach of the

17  CPNs. *Id.* Plaintiffs rely on a Black's Law Dictionary definition of the term "prepayment" as

18  "[p]ayment of debt obligation or expense *before it is due*." Dkt. No. 134 at 7 (emphasis in original

19  quotation). Plaintiffs then contend that the CPNs are "due" on the Maturity Date. *Id.* Plaintiffs

20  do not, however, contend that CPNs *must* be paid on the Maturity Date simply because they are

21  "due." Rather, Plaintiffs contend that "[a]ll the Maturity Date does is set forth the time frame (*i.e.*,

22  temporal limitation) that SLC can *pre*pay Plaintiffs back within the Lockup Period." *Id.* at 8

23  (emphasis in original).

24  Defendants agree that "prepayment" with the written consent of the Majority Note Holders

25  may occur at any time before the notes are due, but contend that the notes are "due" whenever the

26  Majority Note Holders demand the notes to be "due and payable," as described in the CPNs. Dkt.

27  No. 127 at 16 (citing CPNs at 1).

28  In its June 23, 2017 Order, the Court did not dismiss Plaintiffs' breach of contract claims

6

1    based on Plaintiffs' reading of "prepay," and noted that "making all inferences in Plaintiff's favor

2    as required at this stage, Plaintiffs' interpretation is as plausible as Defendants' competing

3    interpretation that 'prepayment' refers to payment before conversion." Dkt. No. 55 at 5. Plaintiffs

4    have since offered no evidence that directly supports their proposed definition. Plaintiffs'

5    interpretation requires the Court to infer that: (1) CPNs are "due" at the Maturity Date, despite no

6    requirement that they be paid at that time, and (2) CPNs are not "due" when demanded by the

7    Majority Note Holders, despite the express language of the CPNs stating that the notes are "due

8    and payable" at that time. Neither inference is supported by the plain language of the CPNs or by

9    any of the extrinsic evidence presented.

10        The Court finds that the language of the CPNs is unambiguous with respect to prepayment

11    with the written consent of the Majority Note Holders. Prepayment may occur at any time before

12    a note is due. The CPNs state that the notes are "due and payable" when demanded by the

13    Majority Note Holders. CPNs at 1. Therefore, the prepayment procedure described in Section 1

14    of the CPNs applies at any time prior to such a demand. Because it is undisputed that no demand

15    of the Majority Note Holders was made prior to July 29, 2016, when Defendants attempted to

16    repay Plaintiffs, the Court **GRANTS** Defendants' motion for summary judgment as to Plaintiffs'

17    first cause of action for breach of contract and Plaintiffs' sixth cause of action for tortious

18    interference.[4]

19            **C.    Next Equity Financing (Second, Third, and Fourth Causes of Action)**

20        The NPAs define "Next Equity Financing" as the sale of at least $750,000 in "Equity

21    Securities," excluding the amount of converted "debt securities." NPAs § 1(i). Plaintiffs contend

22    that a Next Equity Financing occurred when SLC sold ▮▮▮▮▮▮▮ in CPNs in 2012. Dkt. No.

23    116 at 10. Defendants contend that CPNs are "debt securities," and therefore excluded from Next

24    Equity Financing Calculations. Dkt. No. 127 at 11–12.

25        Plaintiffs contend that, because the NPAs define "Equity Securities" as including "any

26

27    _____

28    [4] Plaintiffs' sixth claim for tortious interference alleges that "Talarico and Terrill decided to
improperly twist the language of Section 1 of the CPN to give them a way to pay back Plaintiffs'
investment," and relies on the same reading of Section 1 of the CPN addressed above. FAC ¶ 134.

1   securities . . . convertible into, or exchangeable for (with or without additional consideration), the

2   Company's Common Stock or Preferred Stock," NPAs § 1(f), and CPNs were intended to

3   eventually convert into equity securities, *see* NPAs at 1 ("WHEREAS, the parties intend for the

4   Company to issue in return for the Consideration one or more Notes convertible into shares of the

5   Company's Equity Securities"), all CPNs sold in 2012 were Equity Securities whose sales count

6   toward the $750,000 Next Equity Financing threshold.

7          Plaintiffs' argument is not persuasive.  The NPAs specifically exclude "the aggregate

8   amount of debt securities converted into Equity Securities upon conversion of the Notes" in

9   defining when the $750,000 threshold of sales of "Equity Securities" has been met so as to

10  constitute a "Next Equity Financing."  NPAs § 1(i).  This provision can only logically be read to

11  make clear that sales of Notes (i.e. "debt securities") are irrelevant to whether a Next Equity

12  Financing has occurred:  only once there is a sale of $750,000 of Equity Securities *excluding* the

13  value of such debt securities has there been a Next Equity Financing.  Plaintiffs' argument that this

14  provision "simply means that Notes converted *prior to* Plaintiffs' or sold *prior to* Plaintiffs'

15  investments do not count toward the $750,000," Dkt. No. 123 at 14, finds no support in the record,

16  and does not make sense.  Nothing in § 1(i) says, or even suggests, that the relevant dividing line

17  is when these particular Plaintiffs (or any others) happened to invest.  Instead, the point is that

18  even *converted* Notes do not count toward the $750,000 threshold.  And because even converted

19  Notes do not count, Plaintiffs' claim that sold, but unconverted, Notes *do* count must be rejected

20  as irreconcilable with the plain language of the contract.[5]

21         Further, Plaintiffs' proffered interpretation of Next Equity Financing would render several

22  other clauses of the NPAs incomprehensible.  For example, Section 2.2(a) of the NPAs states that

23  the "principal and unpaid accrued interest of each Note will be automatically converted into

24  Conversion Shares upon the closing of the Next Equity Financing."  NPAs § 2.2(a).  The term

25

---

26  [5] Plaintiffs' contention that the excluded debt securities are only those which have already been
    converted via a Next Equity Financing would nullify the provision excluding debt securities from
27  the calculation.  *See* Dkt. No. 134 at 11 n.4.  No debt securities could possibly have been
    converted at the time they are sold under the terms of the NPAs, as any CPNs sold could only be
28  converted pursuant to a subsequent Next Equity Financing or Corporate Transaction under Section
    2.2 of the NPAs.  NPAs § 2.2.

1  "Conversion Shares" is defined in Section 1(c)(i) "with respect to a conversion pursuant to Section

2  2.2(a)," to mean "the Equity Securities issued in the Next Equity Financing." *Id.* § 1(c)(i).

3  Plaintiffs' interpretation, under which a Next Equity Financing caused by the sale of more than

4  $750,000 of CPNs would automatically convert Plaintiffs' CPNs into different CPNs (the "Equity

5  Securities issued in the Next Equity Financing"), is nonsensical. Because the NPAs do not

6  provide any guidance to calculate the value of the resulting CPNs, Plaintiffs' interpretation would

7  turn a logical contract term into a superfluous provision that would be impossible to apply. [6]

8  Governing principles of contract interpretation require the Court to reject Plaintiffs' reading in

9  favor of a reading that renders the contract capable of execution. *See Edwards v. Arthur Andersen*

10  *LLP*, 44 Cal. 4th 937, 953–54 (2008) ("If a contract is capable of two constructions courts are

11  bound to give such an interpretation as will make it lawful, operative, definite, reasonable and

12  capable of being carried into effect.").

13  Because the NPAs unambiguously exclude CPNs from the Next Equity Financing

14  calculation, there is no genuine factual dispute as to whether a Next Equity Financing occurred

15  before SLC attempted to repay Plaintiffs' respective CPNs. It did not. The Court therefore

16  **GRANTS** Defendants' motion for summary judgment as to Plaintiffs' second cause of action for

17  breach of contract, Plaintiffs' third cause of action for fraudulent concealment, and Plaintiffs'

18  fourth cause of action for conversion.[7]

19  **D.    Amendment or Waiver**

20  Plaintiffs further contend that, when Defendants obtained the vote of the Majority Note

21  Holders to repay Plaintiffs' principal and interest, that vote constituted an amendment in violation

22

23  ───────────────

[6] Defendants contend that CPNs resulting from such a conversion would be less valuable than the

24  original CPNs because each of the CPNs sold after Plaintiffs' had a higher valuation cap. Dkt.
No. 127 at 12–13 (citing Dkt. No. 115-6, Ex. 9). Plaintiffs contend that if "Plaintiffs' valuation

25  cap changed . . . their $100,000 notes would have been adjusted upward . . . to keep the 'new'
notes equivalent." Dkt. No. 134 at 13. The parties' divergent interpretations highlight the absence

26  of *any* contract language addressing the valuation cap or other adjustment for notes converted in
this manner. That the CPNs and NPAs do not contemplate the value of CPNs converted into

27  different CPNs is further evidence that sale of CPNs was not meant to trigger a Next Equity
Financing.

28  [7] Plaintiffs' third and fourth causes of action for fraudulent concealment and conversion,
respectively, are based entirely on the same Next Equity Financing theory.

of Section 7.8 of the NPAs, which reads in relevant part:

> [A]ny term of this Agreement or the Notes may be amended and the observance of any term of this Agreement or the Notes may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of the Company and the Majority Note Holders; *provided, however*, that any such amendment, waiver or consent that materially and adversely treats one or more Lenders in a manner that is disproportionate to such treatment of all other Lenders . . . such amendment or waiver shall also require the written consent of the Lenders disproportionately treated.

NPAs § 7.8 (emphasis in original).[8]

The agreement signed by the Majority Note Holders reads, in part: ██████████

██████████████████████████████████████████

██████████████████████████████████████████████

██████████████ Dkt. No. 115-6, Ex. 15 at SLC00002195. Plaintiffs contend that the agreement constituted an amendment that materially and adversely treated Plaintiffs Bradway and Vigdor disproportionately without their written consent. Dkt. No. 122-6 at 14–15.

Because Defendants had the right to repay Plaintiffs with the consent of a majority of noteholders, *see* Section IV(B) *supra*, the only portion of the Majority Note Holders' signed agreement that even arguably could be claimed to be an amendment to the NPAs is the ability for Defendants to repay Plaintiffs' notes "in part." But Plaintiffs present no evidence, and do not even claim, that Defendants ever attempted to exercise or enforce this alleged amendment. Therefore, even if the Court considers this late-raised theory, it finds based on the undisputed facts that the agreement signed by the Majority Note Holders at Defendants' request did not constitute a breach of the NPAs.

### E. Libel (Fifth Cause of Action)

Plaintiffs assert that Defendant Talarico made the following defamatory statements to investors:

██ ██████████████████████████████████████████

████████████████████

---

[8] The Court notes that Plaintiffs raise this theory of liability for the first time in their summary judgment briefing. *See generally* FAC; Dkt. Nos. 130-5, 130-6.

*See* FAC ¶¶ 122–123.

Plaintiffs contend that the last three statements are either provably false or imply false facts. Dkt. No. 122-6 at 24–25. Plaintiffs contend that each of the statements indicates or implies that Plaintiffs breached the terms of the CPNs and/or NPAs. *Id.* Plaintiffs contend that the statements are provably false based on Talarico's testimony that: ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ *Id.*; Dkt. No. 122-4, Ex. 2 at 248:4–13, 273:17–274:2, 290:11–13. The Court finds that none of the statements are provably false, and none imply provably false facts.

"The dispositive question for the court is whether a reasonable fact finder could conclude that the published statements imply a provably false factual assertion. The answer to that question is determined by applying the 'totality of circumstances' test—a review of the meaning of the language in context and its susceptibility to being proved true or false." *Moyer v. Amador Valley J. Union High Sch. Dist.*, 225 Cal. App. 3d 720, 724–25 (Ct. App. 1990). "The issue whether a communication was a statement of fact or opinion is a question of law to be decided by the court. In making the distinction, the courts have regarded as opinion any broad, unfocused and wholly subjective comment." *Copp v. Paxton*, 45 Cal. App. 4th 829, 837 (1996) (internal quotation marks and citations omitted).

11

None of the allegedly defamatory statements is an actionable statement of fact. When viewed in the context of Plaintiffs' negotiations with Defendants, each statement represents a nonactionable assertion of opinion ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████. None of these statements became provably false based on anything in Talarico's later testimony. Further, the identified statement about what to do *if* ████████████████████████████████ is not provably false because it was made within an exchange about a hypothetical scenario, and was not an assertion of fact. Dkt. No. 122-4 Ex. 14 ████████████████████████████████████████

████ (emphasis added). The Court therefore **GRANTS** summary judgment for Defendants with respect to Plaintiff's libel cause of action.

### F. Breach of the Implied Covenant of Faith and Fair Dealing (Eighth Cause of Action)

Under California law, "[e]very contract imposes on each party a duty of good faith and fair dealing in each performance and in its enforcement." *Carson v. Mercury Ins. Co.*, 210 Cal. App. 4th 409, 429 (Cal. Ct. App. 2012) (internal quotation marks omitted). The covenant exists to ensure that "each party [does] not [] do anything which will deprive the other parties thereto of the benefits of the contract." *Harm v. Frasher*, 181 Cal. App. 2d 405, 417 (Cal. Ct. App. 1960). A party cannot interfere with the performance of the contract and it must do "everything that the contract presupposes that he will do to accomplish its purpose." *Id.*

The implied covenant does not alter a party's existing rights or duties under a contract. *See Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 327, 349–52 (Cal. 2000) ("[W]hile the implied covenant requires mutual fairness in applying a contract's actual terms, it cannot substantively alter those terms."). Nor may Plaintiffs use the implied covenant to merely duplicate a breach of contract claim. *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1401 (Cal. Ct. App. 1990), *as modified on denial of reh'g* (Oct. 31, 2001) ("[A]s [the plaintiffs] have alleged nothing more than a duplicative claim for contract damages, the trial court was correct in sustaining a

1  demurrer to this count without leave to amend."); *California Shoppers, Inc. v. Royal Globe Ins.*

2  *Co.*, 175 Cal. App. 3d 1, 54 (Cal. Ct. App. 1985) ("[B]reach of the implied covenant of good faith

3  and fair dealing involves something beyond breach of the contractual duty itself."). Rather, the

4  implied covenant supplements "the express contractual covenants, to prevent a contracting party

5  from engaging in conduct which (while not technically transgressing the express covenants)

6  frustrates the other party's rights to the benefits of the contract." *Avidity Partners, LLC v. State*,

7  221 Cal. App. 4th 1180, 1204 (Cal. Ct. App. 2013) (internal quotation marks omitted).

8      Plaintiffs' claim that SLC "violated the spirit of the contracts with Plaintiffs" by failing to

9  convert Plaintiffs' CPNs into shares. FAC ¶ 156. As the Court found in its previous Order

10  dismissing Plaintiffs' earlier-pled claim for breach of the Implied Covenant of Faith and Fair

11  Dealing, Plaintiffs' claim relies on the same acts—and seeks the same damages—as their claim for

12  breach of contract. The Court therefore **GRANTS** Defendants' motion for summary judgment as

13  to Plaintiffs' eighth cause of action for breach of the implied covenant of faith and fair dealing.[9]

14  **IV.    CONCLUSION**

15      For the foregoing reasons, the Court **GRANTS** Defendants' motion for summary judgment

16  as to all claims and **DENIES** Plaintiffs' motion for partial summary judgment. The clerk shall

17  vacate all further proceedings, enter judgment in favor of Defendants, and close the file.

18      **IT IS SO ORDERED.**

19  Dated: 11/20/2018

20  _____
    HAYWOOD S. GILLIAM, JR.

21  United States District Judge

22

23

24

25  [9] Plaintiffs separately filed objections to evidence submitted in Defendants' motion for summary
    judgment and opposition to Plaintiffs' motion for summary judgment. Dkt. Nos. 125, 136. The

26  Court DENIES those objections for failing to comply with Local Rule 7-3. L.R. 7-3(a) & 1-3.
    Plaintiffs additionally object to certain testimony of Brett Terrill presented in Defendants' reply

27  brief, contending that the testimony is irrelevant and speculative. Dkt. No. 141. The Court
    considers the testimony relevant to Mr. Terrill's opinion regarding Plaintiffs, and DENIES

28  Plaintiffs' objection.

13